## Case No. 3,877.

DIAS et al. v. The REVENGE.

BUSTAMENTO et al. v. SAME.

[3 Wash. C. C. 262.] [1]

Circuit Court, D. Pennsylvania. April Term, 1814.

WAR—PRIVATEERS—CHARACTER AND STATUS—PIRATICAL ACTS OF OFFICERS AND CREW—LIABILITY OF OWNERS.

1. Libels were filed in the district court, in order to make the owners of the privateer Revenge answer in damages, for the injury sustained by the owners of the Portuguese and Spanish vessels, for piratical acts of the officers and crew of the Revenge, and for which they had been indicted in the circuit court. 3 Wash. C. C. 209. 224, 228 [Cases Nos. 15,494–15,496]. The question, in these cases, was, whether the owners of a commissioned privateer are liable, civilly, for piratical acts committed by the officers and crew of their vessel?

[Cited in Ralston v. The State Rights, Case No. 11,540. Quoted in McGuire v. The Golden Gate, Id. 8,815.]

[1] [Originally published from the MSS. of Hon. Bushrod Washington, Associate Justice of the Supreme Court of the United States, under the supervision of Richard Peters, Jr., Esq.]

2. To a certain extent, a privateer is a national vessel, and forms a part of the national force.

3. Provisions of the laws of the United States, relative to commissions to be granted to privateers; the powers which are derived from such commissions; and the obligations and responsibilities of the owners and commanders of such vessels, under the law.

4. For the conduct of the officers and crew, in the execution of the business in which they may be employed, the owners are, by the maritime law, liable; if through ignorance, or illegally, they do an injury to others. But if the master exceed his authority, and violate his orders, and is guilty of faults or crimes to the injury of others, acting in some business different from that for which he was employed, the owner is not liable.

[Cited in Ralston v. The State Rights. Case No. 11,540; Mendell v. The Martin White, Id. 9,419; In re Mullhouse, Id. 9,910; Knight v. Old Nat. Bank. Id. 7,885; Taylor v. Brigham, Id. 13,781; The Florence, Id. 4,880; Gabrielson v. Waydell. 135 N. Y. 8, 31 N. E. 969. Explained in McGuire v. The Golden Gate, Case No. 8,815.]

5. To warrant the conclusion that the owners of the privateer are liable for injuries done by the master and crew, there must be a capture as prize of war; but in a piratical unauthorized seizure and spoliation, these acts not being in the business of the expedition, the owners are not liable beyond the penalty of the bond given according to law, and the loss of their vessel.

[Cited in McGuire v. The Golden Gate, Case No. 8,815; Tait v. New York Life Ins. Co., Id. 13,726.]

These were appeals from the district court [of the United States for the district] of Pennsylvania, dismissing the libels of the appellants. which sought to make the appellees liable for acts of piracy committed by the officers and crew of the privateer, on the high seas. By the evidence in the first case, it appears, that in November, 1812, the Portuguese brig Triomphe de Mars was chased and brought to by the privateer Revenge, Butler master. under English colours, which continued flying during all the transactions which afterwards took place. The brig was boarded by an officer from the Revenge, who, after a slight view of the ship's papers. presented a pistol to the breast of the captain, and told him that he was a prisoner. He then ordered the officers' trunks to be opened, from which he took all the money he could find, which, together with some sugar, rigging. the clothes belonging to the officers and crew of the brig, and other property, he carried on board the privateer. After remaining on board the brig for about four hours, the officers and crew of the Revenge returned to their own vessel, and the brig was permitted to proceed on her voyage to New-York, where she arrived in safety. In the other case, the Iris, belonging to Spanish subjects. bound on a voyage from Havana to Cadiz. with a cargo also the property of subjects of Spain, was, some time in November, 1812, chased by the above privateer, which fired a gun to bring her to: the ship then fired a gun, hoisted Spanish colours, and lay to. The privateer came up with her, un-

der English colours, and after firing two broadsides into her, and a round or two of musketry, an officer was sent on board the ship, with orders to send the master and some of the crew to the Revenge; which was accordingly executed. The master and crew of the ship were then manacled; after which, a bag containing 800 dollars in silver, eight boxes containing 3000 silver dollars each, and about 400 pounds of bullion, together with a number of other articles, were brought from the ship to the privateer, and deposited in the cabin. All the property of value, found on the persons of the master, his officers and crew, including their wearing apparel, were seized by order of Captain Butler; and after some hours' detention, they were permitted to return to their ship, and to proceed on their voyage. A few days after this, the Revenge again overhauled the Iris attempting to make some port of the United States, in order to procure clothes for the crew. Some of the clothes, which had been taken by the privateer's-men, were then restored to the crew of the Iris; the master was ordered to proceed to Cadiz, and, at the peril of being very severely treated, they were cautioned not to be seen again on the American coast. To ensure the execution of this order, the Revenge accompanied the Spanish ship for two days; when they parted. The money thus plundered from the Spanish ship was, a few days after it was taken, divided amongst the officers and crew of the privateer.

It was contended by C. J. Ingersoll and J. R. Ingersoll, for the appellants, that, upon the doctrine of law, as applicable to master and servant, the owners of a privateer are responsible for acts of piracy, committed by the officers and crew which they have appointed. Their commission being general, to capture the vessels of neutrals as well as of enemies, the master acts within the general scope of his authority, when he commits outrages of this sort; and of course, if he abuse this authority, the owners are liable. Cases cited, 3 Bl. Comm. 431, 430; 1 Ld. Raym. 224, 264, 739; Salk. 234; 2 Dyer, 238b, 161a; 1 Bin. 240; [Vance v. Campbell] 1 Black [66 U. S.] 430; Dom. 238, 239; [Jackson v. Winchester] 4 Dall. [4 U. S.] 206; [Del Col v. Arnold] 3 Dall. [3 U. S.] 333; [Purviance v. Angus] 1 Dall. [1 U. S.] 185; 2 Vern. 543; Roccus, 27; Molloy, 212, 213, 203; 1 C. Rob. Adm. 84; The Mercurius, Id. 288; The Vrouw Judith, Id. 150; The Columbia, Id. 154; The Rising Sun, 2 C. Rob. Adm. 104; The Calypso, Id. 154; The Shepherdess, 5 C. Rob. Adm. 262; The Karasan, Id. 291; The St. Juan Baptista, Id. 33; The Die Fire Damer, Id. 357; Hopk. 65; Bynk. 150; Beaw. Lex. Merc. 207. The principle of all the cases is, that the owner puts it into the power of the master to commit the wrong. 2. This is not a case of piracy, which cannot be committed by a commissioned privateer. Bynk. 128, 135; Azuni, Mar. Law, 3; Woodeson, 443.

Chauncey and Binney, for appellees, contended, that the whole question turned upon the nature of the taking—if as prize, though wrongful, the owners are liable, because the master is authorized to make capture as prize. But if piratical, they are not liable, because the master has no authority to commit acts of piracy. This distinction will explain all the cases, and reconcile them. They cited, upon the two points made by the appellants' counsel, the following cases; Sea Laws, 339, 369, 462, 469; 2 Browne, Adm. & Civ. Law 461, 472; 1 Molloy, 64; Beaw. Lex. Merc. 228; [Vance v. Campbell] 1 Black [66 U. S.] 429; Salk. 282, 441; Moore, 786; Skin. 228; 15 Vin. Abr. 310; Comb. 459; 1 East, 106; Lee, Capt. 224, 228, 229; Molloy, 66; Vatt. Law Nat. 150; Bynk. 129, 133, notes; Sea Laws, 475, 476; Molloy, 55; Grot. bk. 2, c. 17, § 20, Subsec. 1; 2 Azuni, Mar. Law, 352; Rolle, Abr. 530; Moore, 776; 2 Molloy, 90; Sea Laws, 444, 476, 447.

WASHINGTON, Circuit Justice, delivered the opinion of the court.

The argument, in these cases, has taken a very wide range, in which most of the principles and authorities of common, maritime, and national law, which appeared to the counsel to have any bearing upon them, have been pressed into the service of one side or the other. In the view which we shall take of them, we shall commence with the precise question before the court, noticing the authorities which do not directly apply to it, merely as illustrations of the doctrines by which our decision will be governed.

The question is, whether the owner of a commissioned privateer is liable to make good the damages which a neutral has sustained, by an act of piracy, committed upon him by those to whose management the owner had intrusted his vessel? In order to arrive at any satisfactory result, in this inquiry, it will be necessary to consider—1. What is the precise character of a privateer, and what are the acts which she is authorized to perform? To a certain extent, she is a public vessel, and forms a part of the national armed force. The declaration of war authorizes the president to issue letters-of-marque and general reprisal, in such form as he shall think proper, against the vessels, goods, and effects, of the government of Great Britain, and the subjects thereof; and by the prize act, he is empowered to revoke such commissions, whenever it may be his pleasure to do so. The commission, so issued, authorizes the privateer to subdue, seize, and take, any British vessel found within the jurisdictional limits of the United States, or elsewhere on the high seas, and to bring the same into some port of the United States: to recapture American vessels, or those belonging to friendly nations, found in possession of the enemy; and also to detain, seize, and take all vessels and effects, to whomsoever belonging, which may be liable thereto, according to the law of nations,

and the rights of the United States as a power at war; and to bring them in for adjudication. The president is also empowered, to establish suitable instructions for the better governing and directing the conduct of vessels so commissioned, their officers and crews; copies of which are to be delivered to the commanders. And, for the better security of those who may be injured by the improper conduct of such vessels, in the execution of the powers imparted to them by their commissions, the owners (a list of whose names and places of residence is required to be made out and filed with the secretary of state) and the commander of the privateer, are required to give bond to the United States, with sureties, in a certain penalty, with condition that the owners, officers, and crew, to be employed on board such vessel, will observe the treaties and laws of the United States, and the instructions which shall be given them, according to law, for the regulation of their conduct; and will satisfy all damages and injuries which shall be done and committed, contrary to the tenor thereof, by such vessel, during her commission; and to deliver up the same, when revoked by the president. As further evidence of the public character of a vessel so commissioned, the officers and seamen are liable to be tried and punished by a court martial, for any offence committed on board any such vessel, in such manner as the like offences may be tried and punished when committed by any person belonging to the public ships of war of the United States. In other respects, such a vessel is to be considered as private property; equipped and fitted for war, at the sole expense of the owner; navigated by officers and crew, chosen and appointed by himself, and paid by him; and subject to such lawful orders and instructions as he may think proper to give. In consideration of the expense to which the owner thus subjects himself, in co-operating with the public armed force in hostile operations against the enemy, the nation cedes to him, and those he may employ to conduct the privateer, the exclusive benefit of all the spoil which his vessel may lawfully capture as prize; to be distributed between himself and the officers and crew of his vessel, according to any written agreement which shall have been made between them; and in case no such agreement should have been made, then according to a certain ratio prescribed by law. It results from all this, that the employment of a privateer, and the trust confided to her officers and crew, is to subdue and seize the vessels and effects of the enemy found at sea, as well as all other vessels and effects, to whomsoever belonging, which may be liable thereto, according to the law of nations; and to bring all such property into a port of the United States, for adjudication as prize of war.

2. This being the case, the next question is, what are the responsibilities of the owner of the privateer, for any improper conduct of his officers and crew, in the execution of the business in which they were employed? This question is answered by Bynkershoek, in the most satisfactory manner, in the 19th chapter of his treatise on the Law of War: "The master," says this learned jurist, "who captures in consequence of an authority that he has received, is appointed for that particular purpose; and he who appointed him is by that alone responsible for every thing, good or bad, that he may do in the execution of his trust." "He who appointed the captain of a privateer," he continues, "must have known that his business was to make captures, and that if he should execute it improperly, it would be imputed to the owner, for having appointed a dishonest or unskilful captain." In another part of the same chapter, where the author is examining the liability of the owner, in the case of a capture made without authority, he observes that "in such case, the owner cannot be made, in any manner, liable; for he, indeed, has put the master in his place and stead, but merely as to the business which he has ordered him to transact; and if, in the course of that business, the master has committed a fault, or has been guilty of a fraud, the owner is bound to answer for him; otherwise not." It is very clear, that throughout the whole of this chapter, the author is speaking of illegal captures as prize of war, made by privateers; and the principle which lies at the root of all the law 'which he lays down, is, that the owner of a privateer, like the owner of a merchant vessel, is bound to provide honest, skilful, and faithful persons, to navigate her; and that if he fail to do so, he is liable for all damages which others may sustain, by the mistakes or wilful misconduct of those he employs, in executing the business with which he has intrusted them. Against a claim for full compensation for injuries illegally inflicted upon third persons, it is not competent to the owner to shield himself, by saying that the privateer constitutes a part of the naval armed force of the nation; that she acts under the president's instructions; and therefore, he is not liable. The answer given by Bynkershoek in the chapter above noticed, is conclusive.

It may be proper, at this stage of the discussion, to notice the analogies relied upon by the counsel, drawn from the common law, in relation to master and servant; and also, from the maritime law, in relation to owner and master of merchant vessels and privateers.

As to the first;—the vintner whose servant sold unwholesome wine;—the smith, whose servant lamed a horse which he was intrusted to shoe;—the householder, whose servant, by negligently keeping his fire, caused the destruction of an adjoining house;—the carman, whose servant, from want of care, in one instance drove over and maimed a child in the street; and in another, destroyed a pipe of wine in a cart which he overturned;—the

sheriff, whose deputy seized the property of one person, under process against another, and who levied an execution for costs, where none were due; these cases proceed, all of them, upon the same principle. In each of them, the servant was employed by the master, and committed the injury wilfully, or from want of skill in the business in which he was employed. The master, in neither case, gave him an authority, either expressly or impliedly, to act in this manner; but he is not, on that account, excused from making reparation for the wrong done by a third person employed by him, for whose skill and fidelity he is answerable. The general position laid down by Lord Holt, in the case of Middleton v. Fowler, 1 Salk. 282, is, that the master is not chargeable with the acts of his servant, but when he acts in execution of the authority given him. The case of M'Manus v. Crickett, 1 East, 106, proves too much in relation to a case of capture, for which it was cited by the counsel for the appellees. It admits, that for the mischief arising from the unskilful or negligent driving of the master's carriage, the master is liable, in an action on the case; but not so, if it were wilfully committed; because, it is said, that in the latter case, the servant does not act in pursuance of the authority given him. Neither does the master of a privateer, act in pursuance of the authority given him by his owner, when he wilfully commits spoliations on property seized as prize; and yet in this, and in similar cases, the owners are clearly liable for the misconduct of the master. The cases of the innkeeper and common carrier, who are responsible; the first, for the goods of his guest, stolen by any person in his house, and the second, for goods delivered to his servant to carry, of which he is robbed; depend upon a stricter, and somewhat different principle of law. They are not in the situation of common bailies; but from the nature of their employment, and for the safety of the public, they impliedly contract with all persons who may intrust their property to their keeping, to keep it safely; and consequently, they cannot, as in other cases of bailment, excuse a breach of this contract, by alleging that they were robbed of the property; nor can they call upon the injured party to prove a particular neglect.

Passing from the supposed analogy of master and servant, at common law, to cases governed by the maritime law, in relation to owner and master; we find that the former is liable for all the acts of the latter, done in execution of the business in which he is employed, by which third persons are injured; whether the injury was occasioned by the wilful acts, or by the negligence or want of skill of the master. "The owner of a vessel," says Roccus (page 23), "is responsible for the contracts and the criminal acts of the master appointed by him; and also, for the faults of the mariners, committed at sea." In the same note, he explains these general expres-

sions, by saying, "If a servant be guilty of any improprieties in the office or employment assigned him by his master, the master is liable for such improprieties, as he should not have employed such a servant; and the fault may therefore be imputed to him." In subsequent notes, the same author lays it down, that if the master exceed his orders, for example, if he charter his ship generally, against express orders; if he take in a cargo, when he is ordered to take only passengers; if he was appointed for a certain voyage, and he proceeds on a different voyage; the owner is not liable. And, indeed, he lays down the doctrine in very general terms, that the owner is not liable for the faults or crimes of his master, if he exceed his instructions, unless the owner is benefited by such act. We should, however, understand this author to mean, throughout, that the exemption of the owner from responsibility, is only in those cases where the master acts, not only without or against orders, but in some other business than that in which he was employed. It is upon this principle, that the owner is liable for spoliation of papers; for injury sustained by a prize, by the unskilfulness of the prizemaster put on board of her; for embezzlement of the property taken as prize by the officers or crew; and for ill-treatment, unnecessarily inflicted upon the persons of the prize-crew. The master was in the execution of a business for which he was employed, and abused his trust by wilful misconduct, or by the want of skill or care.

3. Having thus seen for what acts of the master, the owner of a merchant vessel or privateer is answerable, the question immediately before the court remains to be examined;—is he liable civilly, for the piratical acts of his master and crew? It is contended, in limine, by the appellant's counsel, that the plunder of these vessels did not amount to piracy; because, in the first place, the master acted under a public commission; and in the next, the vessels, particularly the Iris, were taken possession of as prize; and the subsequent conduct of the officers and crew of the privateer, amounted to nothing more than spoliation and embezzlement, for which it is admitted the owners are liable. As to the first reason, it was so fully examined by this court, in the case of U. S. v. Jones [Case No. 15,494], one of the officers of this privateer, upon an indictment for this alleged piracy, that it will be unnecessary to go over the same ground in this case. That was a case, in which, if in any, the court would have felt inclined to favour the doctrine now contended for, if the principles of law would have warranted it. But it was decided, that the acts imputed to Jones amounted to piracy, for which he was liable to be tried and punished, notwithstanding the commission under which the privateer sailed. As to the second reason assigned, why the robbery committed upon these vessels could not be

piracy, it is totally unsupported by the facts in the case. The hostile act of the privateer, in firing upon the Spanish vessel, was for the purpose of bringing her to; and might, in part, though certainly not to the wanton excess to which it was carried, be justified; if the fact were, as stated by some of the witnesses, that the Spanish vessel fired two guns, loaded with ball, at the Revenge. But the quo animo, with which a merchant vessel is brought to by a vessel of war, cannot be always determined, until after she has obeyed the order to come to, and has submitted to an examination. It is upon a view of her papers, the examination of the cargo, the declarations of those on board, and a variety of other circumstances, that the master of a privateer is to decide, whether the vessel is, in his judgment, good prize or not. If he decides affirmatively, it is then his duty to put a prize-master, with such additional force as he may think necessary for her security, on board of the prize, and to order her to some port of his own country for adjudication. To vest a right in the captor to claim condemnation, he must not only give some evidence that the seizure was made as prize of war, but he must do no act which amounts to an abandonment. But in this case, there was no examination of papers; no seizure as prize, either by words or acts. No person was put on board, in order to conduct these vessels in for adjudication; nor any attempt made by the spoliators, after they came into the United States, to condemn the property which they had seized. All was lawless and indiscriminate pillage; and the plunder which, if the vessel had been legally seized as prize, would have belonged in part to the owner after condemnation, was divided on the spot amongst the officers and crew. The true and only character, then, of this seizure, is clear beyond all possibility of doubt. It was a piratical act, and nothing less. Supposing this to be the case, it is then contended, by the appellant's counsel, that for these acts of piracy the owner of the privateer is liable; because his commission authorizes him to capture, not only property belonging to the enemy, but that of all other persons, to whomsoever belonging, which may be liable thereto, according to the law of nations, and the belligerent rights of the United States; and consequently, that capture generally, being the business in which the officers and crew of the privateer were employed; the owner is liable, upon the admissions of the adverse counsel. This argument is ingenious, but it will not bear examination. It is true, that the commission authorizes the capture of vessels belonging in reality to friends, as well as to enemies, if the friend has so conducted himself, as to bear, pro hac vice, the character of a belligerent; and therefore, if an illegal capture had been made in this case, whether wilfully or by mistake, the owners would have been answerable for all the damages resulting from the act. But there must be a capture as prize of war, in order to warrant the conclusion drawn by the appellants' counsel; because, otherwise, the master did not act in execution of the business with which his owners had charged him. The commission did not authorize him to seize, in any manner he pleased, the property he might find at sea, to whomsoever it might belong, but to seize as prize of war;—to exercise an acknowledged and legitimate belligerent right; in doing which, he might be guilty of a mistake, or might wilfully abuse this right; in either of which cases, he acts at his own and his owner's peril. Still, however, he acts in a lawful employment. But if he turns his back upon the business intrusted to him, and sanctioned by his commission, and commits acts of piracy, for which he was not directly or impliedly employed; such acts are imputable to those only who perform them, and cannot, upon any principle of common, maritime, or national law, be visited upon his owners, beyond the penalty of their bond, and the loss of their vessel. If, from general principles of law, we go in search of adjudged cases upon the point in question, the pursuit terminates in disappointment; and yet this very circumstance strongly fortifies the general principles. Taking it for granted, that acts of piracy have been frequently committed by the commissioned privateers of other civilized nations; and considering also the general incompetency of the master and crew, to make reparation for the injuries which such acts inflict, it is scarce possible, that cases should not have occurred, in which the owners were called upon to make the compensation, unless from a prevailing opinion amongst legal men, that they were not liable. It is by no means a satisfactory answer to this remark, to say, that the owners, when these claims have been made, may have adjusted them without suit, considering the law to be against them; because, so far as a dictum upon the point is to be met with, the liability of the owners is denied. It must at the same time be admitted, that there is very little information upon the subject, from any elementary writer. We have looked into the cases cited, and relied upon by the counsel for the appellees, without having derived much satisfaction or assistance from them. The passages read from the Sea Laws, from Molloy, and from Beawes' Lex Mercatoria, refer to Rolle, Abr. 530, as their authority; and where Beawes gives an opinion as his own, it is so obscurely stated, that it is impossible to say, whether he is speaking of captures or piracies. Lee, in the place which was cited, is clearly speaking of captures; and consequently, his opinion, that in such a case, the owner is not bound to answer beyond his ship, and the penalty of his bond, is not law. Rolle's Abridgment, therefore, is the only authority which was cited; and he merely says, that "if a letter-of-

marque commit an act of piracy on a friend of the king, without the knowledge or assent or the owner; yet, for this, the owner shall lose his vessel by the admiralty law, of which our law ought to take notice;" but nothing is said respecting the personal responsibility of the owners. We feel, nevertheless, perfectly satisfied, with deciding this question upon the general principles of law before stated, fortified by the circumstance of the absence of any contrary decision or dictum, to be met with in any book.

The transactions which have given rise to these suits, are marked by circumstances of such wicked atrocity, that it is impossible to think of them without feeling the deepest disgust and abhorrence. Regardless of their duty to their owners, to their country, and to their God—lost to all the feelings of justice, honour, and humanity—the persons engaged in these disgraceful robberies, were not satisfied with plundering these unprotected strangers; they even denied to the officers and crew of the Spanish ship, the liberty of seeking an asylum in the United States, where they might obtain the means of rendering their passage across the Atlantic, at that advanced season of the year, more comfortable and more safe, than it was likely to prove in their destitute and disabled condition. But concealment of their crimes, was to these men every thing; the comfort, and even the lives of those whom they had injured, nothing;—that the laws are incompetent to afford a suitable redress to the sufferers, is to be regretted. But let these foreigners remember, that this defect does not arise from any thing peculiar to the jurisprudence and laws of the United States; but that it is universal, and exists equally in their own, and every other country, where the civil and maritime laws prevail. The liability of those to whom they owe their wrongs, is admitted; their inability to make retribution, if such should be their situation, is a misfortune for which the tribunals of no country can supply a remedy. Those against whom the redress is sought, in this instance, did not commit, or in any manner authorize or countenance, the spoliation of which the libellants complain. They are, therefore, equally innocent with the libellants; and are equally entitled to the protection of the law. The government has done all that a just nation can be required to do, and all that our free constitution would permit, to bring the principal offenders to justice. They have been prosecuted at the public expense; and the law officer of this court, charged with the management of the prosecution, has faithfully and ably performed his duty. But a jury, selected according to the humane provisions of our laws, have acquitted them, upon evidence different from that which has appeared in these cases; and such as, we doubt not, that body most conscientiously thought was insufficient to warrant the conviction of the accused. All, then, that remains, for us, is to pronounce what we as conscientiously believe to be the law in these cases; which is, that the decrees of the district court ought to be affirmed.